IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JP Morgan Chase Bank, National Association, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 CV 5770 |
| | ) | |
| Robert Kowalski, a/k/a Robert M. Kowalski, | ) | 1512 W. Polk Street, Chicago IL 60607 |
| Unknown Owners and Non-Record Claimants; | ) | |
| Chicago Title Land Trust Company s/i/i to | ) | Honorable Thomas M. Durkin |
| Bridgeview Bank Group f/k/a Bridgeview Bank | ) | |
| and Trust Company, as trustee under trust | ) | |
| agreement dated April 24, 1993 and known as | ) | |
| Trust Number 1-2228, Martha Padilla, Federal | ) | |
| Deposit Insurance Corporation, as receiver for | ) | |
| Washington Federal Bank for Savings, | ) | |
| | ) | |
| Defendants. | ) | |

**THIRD-PARTY PLAINTIFF'S FIRST AMENDED
THIRD-PARTY COMPLAINT AGAINST FIRST MIDWEST BANK**

The Third-Party Plaintiff, Martha Padilla, by and through her attorneys, Ziccardi Law Offices, and for her First Amended Third-Party Complaint against First Midwest Bank as successor in interest to Bridgeview Bank and Trust, hereby states as follows:

1. Third-Party Plaintiff, Martha Padilla ("Padilla"), is a citizen and resident of Chicago, Illinois.

2. Third-Party Defendant, First Midwest Bank ("First Midwest"), is a community bank primarily serving the metropolitan suburban communities of Chicago. In or around May 2019, First Midwest acquired the assets of Bridgeview Bank Group, who was the successor in interest to Bridgeview Bank and Trust Company.

3. On or about October 5, 1993, Padilla's husband at the time, Robert Kowalski ("Kowalski"), became the beneficial owner of the real property located at 1512 W. Polk in

Chicago, Illinois (the "Property"). In particular, Kowalski had title to the Property placed in a land trust with Bridgeview Bank and Trust Company ("Bridgeview Bank") as trustee under trust number 1-2228 dated April 4, 1993 (the "Land Trust"). A copy of the Land Trust Agreement is attached hereto as Exhibit A.

4. On a date unknown to Padilla, Bridgeview Bank transferred the Land Trust to Bridgeview Bank Group. Thereafter, on a date unknown to Padilla, Bridgeview Bank Group transferred the Land Trust to Chicago Title Land Trust Company ("CTLT"). Notwithstanding said transfers, the acts complained of herein are believed to have occurred prior to the transfer of the Land Trust to CTLT. As such, Padilla brings this claim against First Midwest Bank, who acquired Bridgeview Bank and Bridgeview Bank Group, for acts that occurred while Bridgeview Bank and Bridgeview Bank Group acted as the trustee of the Land Trust, as more specifically set forth herein.

5. At the time of acquisition of the Property, Kowalski was the sole beneficiary of the Land Trust.

6. However, on or about September 5, 1997, the Land Trust Agreement was amended to add Padilla as a beneficial owner thereof. A copy of the Assignment of Beneficial Interest is attached hereto as Exhibit B. Since the execution of this Assignment, Padilla has been a beneficial owner of the Land Trust.

7. As a beneficial owner of the Land Trust, Padilla also had, along with Kowalski, power of direction over the Land Trust. *See*, Ex. B. As a result, Bridgeview Bank, as trustee, could transfer title to the Property or grant a security interest therein only upon the written direction of both Kowalski and Padilla.

8. As the trustee, at all times relevant, Bridgeview Bank had a copy of the Land Trust Agreement, as well as the amendment thereto.

9. As the trustee of the Land Trust, Bridgeview Bank knew, or reasonably should have known, that both Kowalski and Padilla had the power of direction over the Land Trust, and that any direction to transfer or execute documents to encumber the Property had to be properly authorized by both Kowalski and Padilla.

## The Washington Mutual Bank Loan

10. On or about May 8, 1998, Bridgeview Bank, as trustee, executed a mortgage (the "WMB Mortgage") on the Property in favor of Washington Mutual Bank for $382,000.00, as well as a promissory note, copies of which are attached hereto as Exhibit C.

11. In addition to the mortgage, Bridgeview Bank also executed an Illinois Land Trust Rider (the "Rider"), which provides, in pertinent part:

> This Security Instrument is executed by Bridgeview Bank and Trust Company (the "Trustee"), not personally, but as Trustee as aforesaid in the exercise of the power and authority conferred upon and vested in it as such Trustee and Bridgeview Bank and Trust Company hereby warrants that it possesses full power and authority to execute this instrument ….

*See*, Ex. C, Land Trust Rider, ¶ 4.

12. However, at no time prior to execution of the WMB Mortgage and Rider did Bridgeview Bank receive from Padilla an executed letter of direction authorizing Bridgeview Bank to execute the WMB Mortgage and related documents, as Padilla has never signed, or authorized anyone to sign on her behalf, a letter of direction for Bridgeview Bank to sign the WMB Mortgage and related loan documents.

13. Moreover, at no time prior to, or after, execution of the WMB Mortgage and related documents did Bridgeview Bank notify Padilla that it was going to execute, or had executed, said documents to encumber the Property.

14. Padilla first became aware that Bridgeview Bank had executed the WMB Mortgage and related documents when she received notice that JP Morgan Chase Bank, successor to Washington Mutual Bank, had filed a foreclosure action against the Property in May 2019.

**The Washington Federal Bank for Savings Loan**

15. On or about August 10, 1999, Bridgeview Bank, as trustee, executed a mortgage (the "WFB Mortgage") on the Property in favor of Washington Federal Bank for Savings for $400,000.00, a copy of which is attached hereto as Exhibit D.

16. At no time prior to execution of the WFB Mortgage did Bridgeview Bank receive from Padilla an executed letter of direction authorizing Bridgeview Bank to execute the mortgage and related documents to Washington Federal Bank, as Padilla has never signed, or authorized anyone to sign on her behalf, a letter of direction for Bridgeview Bank to sign the WFB Mortgage and related loan documents.

17. Moreover, at no time prior to, or after, execution of the WFB Mortgage and related documents did Bridgeview Bank notify Padilla that it was going to execute, or had executed, said documents to encumber the Property.

18. On or about July 28, 2000, Bridgeview Bank, as trustee, executed a Modification of Mortgage which purported to extend additional credit thereunder. A copy of this Modification is attached hereto as Exhibit E. In executing this Modification, Bridgeview Bank represented

that it had the "full legal power, right and authority to execute this Modification and mortgage, pledge and convey the Fee Simple Estate …" *See*, Ex. E, p. 2, ¶ (e).

19. At no time prior to execution of the Modification to the WFB Mortgage did Bridgeview Bank receive from Padilla an executed letter of direction authorizing Bridgeview Bank to execute said Modification to Washington Federal Bank, as Padilla has never signed, or authorized anyone to sign on her behalf, a letter of direction for Bridgeview Bank to sign the July 28, 2000 Modification to the WFB Mortgage and related loan documents.

20. Moreover, at no time prior to, or after, execution of the Modification of the WFB Mortgage did Bridgeview Bank notify Padilla that it was going to execute, or had executed, said documents to further encumber the Property.

21. On or about November 1, 2004, Bridgeview Bank, as trustee, executed another Modification of Mortgage which purported to extend additional credit thereunder. A copy of this Modification is attached hereto as Exhibit F. In executing this Modification, Bridgeview Bank represented that it had the "full legal power, right and authority to execute this Modification and mortgage, pledge and convey the Fee Simple Estate …" *See*, Ex. F, p. 2, ¶ (e).

22. At no time prior to execution of the November 1, 2004 Modification to the WFB Mortgage did Bridgeview Bank receive from Padilla an executed letter of direction authorizing Bridgeview Bank to execute said Modification to Washington Federal Bank, as Padilla has never signed, or authorized anyone to sign on her behalf, a letter of direction for Bridgeview Bank to sign the November 1, 2004 Modification to the WFB Mortgage and related loan documents.

23. Moreover, at no time prior to, or after, execution of the November 1, 2004 Modification of the WFB Mortgage did Bridgeview Bank notify Padilla that it was going to execute, or had executed, said documents to further encumber the Property.

24. Also attached to the November 1, 2004 Modification is an Extension to Note. Although the Extension to Note document included with the November 1, 2004 Modification to the WFB Mortgage purports to bear Padilla's signature, at no time did Padilla sign said Extension to Note, nor did she authorize anyone to sign it on her behalf. Further, at no time did Bridgeview Bank take any action to verify that Padilla had in fact signed the Extension to Note.

25. Upon information and belief, Kowalski, or someone acting at his direction, signed Padilla's name to the Extension to Note, as the signature bears no resemblance to Padilla's signature. At no time did Kowalski tell Padilla that he had signed, or authorized someone to sign on her behalf, Padilla's name on the November 1, 2004 Modification to the WFB Mortgage or the Extension to Note.

26. Also attached to the November 1, 2004 Modification is the Washington Federal Bank for Savings Note Modification Agreement. Although the Note Modification Agreement document included with the November 1, 2004 Modification to the WFB Mortgage purports to bear Padilla's signature, at no time did Padilla sign said Note Modification Agreement, nor did she authorize anyone to sign it on her behalf. Further, at no time did Bridgeview Bank take any action to verify that Padilla had in fact signed the Note Modification Agreement.

27. Upon information and belief, Kowalski, or someone acting at his direction, signed Padilla's name to the Note Modification Agreement, as the signature bears no resemblance to Padilla's signature. At no time did Kowalski tell Padilla that he had signed, or authorized someone to sign on her behalf, Padilla's name on the November 1, 2004 Modification to the WFB Mortgage or the Note Modification Agreement.

28. On or about July 31, 2007, Bridgeview Bank, as trustee, executed another Modification of Mortgage which purported to extend additional credit thereunder. A copy of this

Modification is attached hereto as Exhibit G. In executing this Modification, Bridgeview Bank represented that it had the "full legal power, right and authority to execute this Modification and mortgage, pledge and convey the Fee Simple Estate …" *See*, Ex. G, p. 2, ¶ (e).

29. At no time prior to execution of the July 31, 2007 Modification to the WFB Mortgage did Bridgeview Bank receive from Padilla an executed letter of direction authorizing Bridgeview Bank to execute said Modification to Washington Federal Bank, as Padilla has never signed, or authorized anyone to sign on her behalf, a letter of direction for Bridgeview Bank to sign the July 31, 2007 WFB Mortgage and related loan documents.

30. Moreover, at no time prior to, or after, execution of the July 31, 2007 Modification of the WFB Mortgage did Bridgeview Bank notify Padilla that it was going to execute, or had executed, said documents to further encumber the Property.

31. In conjunction with the July 31, 2007 Modification to the WFB Mortgage, included was a Washington Federal Bank for Savings Note Modification Agreement. Although this Agreement purports to bear Padilla's signature, at no time did Padilla sign the July 31, 2007 Note Modification Agreement, nor did she authorize anyone to sign it on her behalf. At no time did Bridgeview Bank take any action to verify that Padilla had in fact signed the July 31, 2007 Modification to Mortgage.

32. Upon information and belief, Kowalski, or someone acting at his direction, signed Padilla's name to the Note Modification Agreement, as the signature bears no resemblance to Padilla's actual signature. At no time did Kowalski tell Padilla that he had signed, or authorized someone to sign on her behalf, Padilla's name on the July 31, 2007 Modification to the WFB Mortgage or the Note Modification Agreement.

33. Additionally, the July 31, 2007 Note Modification Agreement included a Consent and Acknowledgement of Guarantor document which purports to bear Padilla's signature. Padilla, however, did not execute this Consent and Acknowledgement, nor did she authorize anyone to execute the document on her behalf. At no time did anyone from Bridgeview Bank contact Padilla to confirm her execution of, and agreement to, the Consent and Acknowledgement of Guarantor.

34. Upon information and belief, Kowalski, or someone acting at his direction, signed Padilla's name to the July 31, 2007 Consent and Acknowledgement, as the signature bears no resemblance to Padilla's actual signature. At no time did Kowalski tell Padilla that he had signed, or authorized someone to sign on her behalf, Padilla's name on the Consent and Acknowledgement.

35. Padilla first became aware that Bridgeview Bank had executed the WFB Mortgage and various Modifications thereto when an attorney for the FDIC advised of such during Kowalski's bankruptcy proceeding, which was filed in 2018. On February 22, 2019, Padilla testified under oath for her Rule 2004 Examination. Relevant pages from the transcript of Padilla's Rule 2004 Examination are attached hereto as Exhibit H. As Padilla testified, at no time prior to the filing of Kowalski's bankruptcy case in 2018 did Padilla review or receive a copy of any of the WFB Mortgage documents, the modifications thereof, or any of the extension agreements or consents purportedly executed in connection with said modifications. In particular, neither WFB nor Bridgeview Bank at any time provided any of these documents to Padilla.

36. In fact, during Padilla's divorce proceeding which began in 2014, she had subpoenaed documents from Washington Federal Bank for Savings pertaining to various loans,

including loans on the Property. Instead of responding, Washington Federal Bank vigorously opposed compliance with said subpoenas and filed Motions to Quash the subpoenas to avoid production. After numerous delays and obstructive efforts, Washington Federal Bank ultimately never responded to the subpoena nor did it produce documents related to any WFB Mortgages.

37. Padilla also subpoenaed Washington Federal Bank President, John Gembara, for his deposition, but he too took extensive efforts to avoid appearing for his deposition. Ultimately Gembara never appeared in response to the subpoena, as he committed suicide before Padilla was able to compel his appearance.

38. After learning of the WFB Mortgage in 2018, Padilla further discovered that Kowalski had been engaged in a large-scale fraud scheme with various officers at Washington Federal Bank for Savings. In particular, over many years, Kowalski acquired title to numerous investment properties. Kowalski received numerous loans from WFB which totaling more than $29 million were part of the ongoing scheme between the bank officers and Kowalski, as the majority of the loans, if not all, were granted without any documentation and were not repaid, nor did WFB seek or intend to collect payment of said loans from Kowalski.

39. As part of the fraudulent scheme, Kowalski and the bank officials created false promissory notes, false loan modifications and extension agreements, and other false loan documents to give the appearance that the loans to Kowalski from WFB had been properly documented and authorized.

40. In August 2020, upon issuance of the Second Superseding Indictment arising from the fraud scheme at Washington Federal Bank for Savings, Padilla learned that the Modification Agreements purporting to bear Padilla's signature were part of the fraudulent scheme conducted by Kowalski and Washington Federal Bank officers, as they were witnessed

and executed, at least in part, by some of Kowalski's co-conspirators, including bank president John Gembara and corporate secretary, Van B. Tran a/k/a Jane V. Tran.

## COUNT I
### (Breach of Fiduciary Duty)

41. Padilla realleges and incorporates the allegations set forth in paragraphs 1-40 above as though fully set forth as and for paragraph 41 of this Count I.

42. As trustee, Bridgeview Bank and Bridgeview Bank Group owed Padilla the following fiduciary duties:

   a. To review the Trust Agreement, including amendments thereto, prior to execution of any documents on behalf of the Land Trust, to ensure that it had received the proper authorization from the individuals holding power of direction over the Land Trust;

   b. To act in accordance with the terms of the Land Trust, including but not limited to the duty to execute documents only upon receipt of a letter of direction properly executed by all individuals holding such power;

   c. To act in the best interests of the Land Trust and its beneficiaries by confirming that all letters of direction have been properly executed.

43. Bridgeview Bank and Bridgeview Bank Group breached its fiduciary duties to Padilla by failing to:

   a. Failing to review the Trust Agreement and amendment thereto prior to executing the WMB Mortgage and related documents, and prior to executing the WFB Mortgage and numerous modifications thereto;

   b. Failing to receive from Padilla a properly executed letter of direction prior to executing the WMB Mortgage and related documents, and prior to executing the WFB Mortgage and numerous modifications thereto;

   c. Failing to protect and act in the best interests of the Land Trust by failing to confirm that all letters of direction authorizing the execution of the WMB Mortgage and related documents, and the WFB Mortgage and related documents, had been properly authorized and executed by Padilla.

44. As a result of said breaches of these fiduciary duties, Padilla has sustained damages in that the Property is encumbered with two mortgages, neither of which she authorized or was aware. Further, Padilla has sustained damages to the extent that she is required to repay all, or any portion, of the WMB Mortgage and/or WFB Mortgage.

WHEREFORE, the Third-Party Plaintiff, Martha Padilla, respectfully requests that this Honorable Court enter judgment in her favor and against the Third-Party Defendant, First Midwest Bank, in the amount of the existing balances due on the mortgages recorded against the Property, and grant such other relief as this Honorable Court deems necessary and appropriate.

MARTHA PADILLA

By:    s/Joseph R. Ziccardi
      Attorney for Third-Party Plaintiff Padilla

Joseph R. Ziccardi (jziccardi@ziccardilaw.com)
**ZICCARDI LAW OFFICES**
77 W. Washington, Suite 705
Chicago, Illinois 60602
Tel. (312) 372-3477
Fax (312) 372-4684